In re CAJUN ELECTRIC POWER COOPERATIVE, INC., Debtor.

The Cajun Electric Members Committee, et als., Plaintiff,

v.

Ralph R. Mabey, as Trustee for Cajun Electric Power Cooperative, Inc., and Teche Electric Cooperative, Inc., Defendants.

Civ.A. No. 94–2763 B–2.
Bankruptcy No. 94–11474.
Adversary No. 96–1052.

United States Bankruptcy Court, M.D. Louisiana.

Feb. 11, 1999.

See also 230 B.R. 683, 230 B.R. 715.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Lon A. Jenkins, Annette W. Jarvis and Mark Dykes, LeBoeuf, Lamb, Greene, & MacRae, LLP, Salt Lake City, Utah, John Parks, LeBoeuf, Lamb, Greene, & MacRae, LLP, Denver, CO, for Ralph R. Mabey, chapter 11 Trustee.

Henry J. Kaim, Edward L. Ripley, and Patricia B. Tomasco, Sheinfeld, Maley & Kay, Houston, Texas, Bobby S. Gilliam, Wilkinson, Carmody & Gilliam, Shreveport, LA, for Southwest Louisiana Power Company.

Melanie R. Cohen and Benjamin Schwartz, Altheimer & Gray, Chicago, Illinois, John M. Sharp, Baton Rouge, LA, for the Committee of Certain Members.

R. Patrick Vance and Laura Leigh Blackston, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, New Orleans, LA, for American Commercial Marine Services.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Peter J. Lucas, Doherty, Rumble, & Butler, P.C., Denver, Colorado, for Western Fuels Association.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Ronald M. Martin, Holland & Hart, LLP, Colorado Springs, Colorado, for Triton Coal Company, for Triton Coal Company.

James R. Lackie and Mark D. Mese, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Burlington Northern and Santa Fe Railway.

Gerald Amero, Pierce, Atwood, Scribner, Allen, Portland Maine, Steve Chiccarrelli, Breazeale, Sachse & Wilson, Baton Rouge, LA, for Official Committee of Unsecured Creditors.

Patrick Henry, Sharp, Henry, Cernigliz, Colvin & Weaver, Homer, LA, for Claiborne Electric Power Cooperative.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, James Davidson and Mark Andrus, Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette, LA, for Southwest Louisiana Membership Corp.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, Russell Purvis, Smith, Taliaferro, Purvis & Boothe, Jonesville, LA, for Concordia Electric Cooperative, Inc.

James B. Supple, Biggs, Trowbridge, Supple & Cremaldi, Franklin, LA, Berry D. Spears, Winstead, Sechrest & Minick, Austin, TX, for Pointe Coupee Electric Membership Corp.

Tom Phillips and Courtney Smart, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Enteray Gulf States.

Frances M. Toole and Brendan Collins, U.S. Dept. of Justice, Washington, D.C., for Rural Utilities Service.

Matt J. Farley, Preaus, Roddy & Krebs, New Orleans, LA, Michael A. Rosenthal and Janet M. Weiss, Gibson, Dunn & Crutcher, LLP, New York City, for Louisiana Generating, LLC.

Michael R. Fontham, Noel Darce and Karen Freese, Stone, Pigman, Walther, Wittman & Hutchison, New Orleans, LA, for Louisiana Public Service Commission.

**REASONS FOR DECISION**

GERALD H. SCHIFF, Bankruptcy Judge.

This adversary proceeding was brought by the Cajun Electric Members Committee ("Plaintiffs" or "Committee") seeking a declaratory judgment with respect to several issues pending in this rather massive and substantially complex chapter 11 proceeding. The complaint for declaratory judgment sought relief under eight separate counts, as follows:

Count I The 1976 Superseding Wholesale Power Contracts between Cajun and its Members (the "Supply Contracts") are absolutely null.

Count II The Supply Contracts executed by Southwest Louisiana Electric Membership Corporation ("SLEMCO") is absolutely null.

Count III Nullity of the SLEMCO Supply Contracts renders the other Supply Contracts unenforceable.

Count IV The Supply Contracts are not assumable or assignable without the consent of the Members.

Count V The Supply Contracts are not assumable or assignable without the consent of the Louisiana Public Service Commission ("LPSC").

Count VI A. Any assumption or assignment of the Supply Contracts must include all provisions of such Supply Contracts; and

B. The Supply Contracts include the following provisions: (1) the Members have the contractual right to elect Cajun's board of directors; (2) Cajun's board of directors, elected by the Members, has the right to set the rates; (3) Cajun may not earn a profit; and (4) LPSC jurisdiction and Louisiana regulatory law are part of the Supply Contracts.

Count VII A. The plan filed by the Trustee on April 22, 1996 (the "Trustee's Plan"), or any similar plan transferring Cajun's assets to a buyer and transforming Cajun into a "paper G & T" to serve as a conduit for assigning the Supply Contracts to the buyer, would modify the Supply Contracts without the Member's consent, in violation of Louisiana law and bankruptcy law.

B. The Trustee's Plan, or any similar plan transferring Cajun's assets to a buyer and transforming Cajun into a "paper G & T" to serve as a conduit for assigning the Supply Contracts to the buyer, would result in a de facto assignment of the Supply Contracts without the Members' consent, in violation of applicable Louisiana law and bankruptcy law.

C. The Trustee's Plan, or any similar plan transferring Cajun's assets to a buyer and transforming Cajun into a "paper G & T" to buyer, would result in a de facto assignment of the Supply Contracts without the LPSC's consent, in violation of applicable Louisiana law and bankruptcy law.

Count VIII Cajun's Bylaws are an executory contract that must be included in any assumption or assignment of the Supply Contracts.

Ralph Mabey, as Trustee of Cajun Electric Power Cooperative, Inc., ("Defendant" or "Trustee") has filed a Counter Claim consisting of two counts, as follows:

Count I If the Supply Contracts are void, the Trustee is entitled to judgment against the Members for the expenses incurred by Cajun in reliance upon the validity and enforceability of the Supply Contracts ($4,137,540,063.66).

Count II If the Supply Contracts are null and void ab initio because they were not approved by the LPSC, the Trustee is entitled to a declaratory judgment that the original Wholesale Power Contracts, as amended, between Cajun and the Members, except SLEMCO, are revived and the Members, other than SLEMCO, are bound thereby.

The Plaintiffs filed a Motion for Summary Judgment on Counts I, II and IV through VII, and the Defendant filed a Motion for Summary Judgment on the same counts together with Counts I and II of the counter claim. On April 23, 1997, the court announced in open court its intention with regard to the rulings on the motions for summary judgment. Trial on the remaining issues was held in conjunction with the hearing on confirmation of the three plans pending in the case.

These Reasons for Decision constitute the court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

## I. JURISDICTION

The court has jurisdiction over this proceeding pursuant to the provisions of 28 U.S.C. § 1334. This matter was referred to this court by United States District Judge Frank J. Polozola. No party in interest has requested a withdrawal of the reference. The court finds that this is a core proceeding pursuant to the provisions of 28 U.S.C. § 157(b)(2).

## II. FACTS

### A. *Cajun's Cooperative Structure*

Cajun Electric Power Cooperative, Inc. ("Cajun") was formed in 1962, for the purpose of constructing and operating generating and transmission facilities. Cajun is a nonprofit corporation organized and existing under the electric cooperative law of the State of Louisiana, La.R.S. 12:401–430 (hereinafter, "Elec. Coop. Law"). In the industry, an entity like Cajun which both generates

and transmits electricity is known as a "G & T."

The following 12 Louisiana cooperatives are members of Cajun: Beauregard Electric Cooperative, Inc., Concordia Electric Cooperative, Inc., Dixie Electric Membership Corporation, Jefferson Davis Electric Cooperative, Inc., Northeast Louisiana Power Cooperative, Inc., Pointe Coupee Electric Membership Corporation, South Louisiana Electric Cooperative Association, Southwest Louisiana Electric Membership Corporation, Valley Electric Membership Corporation, Washington–St. Tammany Electric Cooperative, Inc., Claiborne Electric Cooperative, Inc., and Teche Electric Cooperative, Inc. (collectively, "Members" and individually, "Member"). Each Member is itself a member-owned electric cooperative utility, organized pursuant to the Elec. Coop. Law. Each Member purchases electric power at wholesale from Cajun and in turn distributes that power at retail to its consumers, who are, generally, the rural citizens of the State of Louisiana.

## B. *LPSC Jurisdiction and State Regulatory Law*

In 1970, the jurisdiction of the LPSC was expanded by statute to include electric cooperatives. In 1974, the LPSC was mandated by Article IV, § 21 of the Louisiana Constitution to regulate all public utilities, including electric cooperatives such as Cajun. *See, generally, Cajun Elec. Power Coop. v. Louisiana Pub. Serv. Comm'n,* 544 So.2d 362 (La.1989), *cert. denied,* 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 536 (1989).

In furtherance of its authority to regulate transactions by public utilities under its jurisdiction, the LPSC promulgated a series of General Orders, including General Order dated June 16, 1953:

> The sale, lease, merger, consolidation, or other change in the ownership of the assets of public utilities or any controlling part thereof subject to the jurisdiction of this Commission is hereby prohibited without first having obtained an order of authority from the Commission for such change in ownership.

This General Order was supplemented by LPSC General Order dated October 28, 1968, which provides:

> No utility or carrier under the jurisdiction of the Louisiana Public Service Commission shall enter into a contract, or combination of related contracts, convey lease, or acquire assets of any kind, or incur any obligation, or merge or combine with another utility, or carrier, or divide into two or more utilities or carriers, where the values involved in such action exceed one percent (1%) of the gross assets of such regulated utility or carrier, or subsidiary thereof, or in any way commit itself to take such action, or affect any right, interest, asset or obligation involved in such action without prior full disclosure of the entire intendment and plan of such utility or carrier with regard to such action, and prior official action or approval or non-opposition by the Louisiana Public Service Commission.

The 1953 and 1968 General Orders were further supplemented by a General Order dated March 18, 1994, which provides in pertinent part that:

> No utility ... subject to the jurisdiction of the Louisiana Public Service Commission shall sell, assign, lease, transfer, mortgage, or otherwise dispose of or encumber the whole or any part of its franchise, works, property, or system, nor by any means direct or indirect, merge or consolidate its utility works, operations, systems, franchises, or any part thereof, nor transfer control or ownership of any of the assets, common stock or other indicia of control of the utility to any other person, corporation, partnership, limited liability company, utility, common carrier, subsidiary, affiliated entity or any other entity nor merge or combine with another person, corporation, partnership, limited liability company, utility, common carrier, subsidiary, affiliated company or any other entity or divide into two or more utilities ..., where the values involved in such action exceed one percent (1%) of the gross assets of such regulated utility ..., nor in any way commit itself to take such action or affect any right, interest, asset, obligation, stock ownership, or

control, involved in such action without prior full disclosure of the prior intendment and plan of such utility ... with regard to such action and without prior official action of approval or official action of non-opposition by the Louisiana Public Service Commission. This section is intended to apply to any transfer of the ownership and/or control of public utilities ... regardless of the means used to accomplish that transfer.

## C. *The Supply Contracts*

In 1976, the Members executed Superseding Wholesale Power Contracts (the "Supply Contracts") pursuant to which they agreed to purchase 100% of their power requirements from Cajun until the year 2021. The Supply Contracts were neither reviewed nor approved by the LPSC.

In 1990, nine of the Members (excluding Valley, WST, and Claiborne) executed an amendment extending the term of the Supply Contracts to December 31, 2026. In this instance, however, the LPSC did review and approve the five-year extension as part of its approval of the debt restructure agreement ("DRA") between Cajun and the Rural Electrification Administration ("REA"). The LPSC's Order provided that:

> The commitment by Cajun and its members to the DRA—even with the approval of the Commission—will not diminish this Commission's control over rates. Thus, if ratemaking considerations dictate that Cajun's rates be set at a level inadequate to make the payments required under the agreement, rates nevertheless could be set at that level ....

Order No. U–18880, 1990 La.PUC LEXIS 64 (La.P.S.C.1990) at 10.

Section 1 of the Supply Contracts provides:

> The Seller shall sell and deliver to the *Member* and the *Member* shall purchase and receive from the Seller all electric power and energy which the *Member* shall require for the operation of the *Member's* system to the extent that the Seller shall

have such power and energy and facilities available .... (Emphasis added.)

The Trustee's Plan proposes to sell virtually all of Cajun's non-nuclear assets to a new entity, Louisiana Generating LLC ("Generating"), pursuant to an asset purchase agreement ("the Purchase Agreement"). Although the Trustee proposes the sale of Cajun's generating assets, the Trustee's Plan envisions that Cajun "will continue in existence as a viable Louisiana Cooperative which supplies power to its Members."[1] Without any generating assets, Cajun after confirmation ("Reorganized Cajun") will obtain essentially all the power it sells to its members from Generating under a Power Supply and Service Agreement ("PSSA"). Alternatively, the Trustee's Plan permits each Member to negotiate a contract with Generating under which it "may obtain its power requirements directly from Generating rather than having its [Supply] Contract assumed or renegotiated with Reorganized Cajun."[2]

## III. NULLITY OF SUPPLY CONTRACTS
## (COUNTS I AND II)

In Counts I and II, the Plaintiffs argue that the Supply Contracts are absolutely null and unenforceable because they were executed in contravention of the 1968 General Order. "A contract is absolutely null when it violates a rule of public order ...." La.Civ. Code art.2030. The Plaintiffs argue that the 1968 General Order is such a rule of public order.

The Trustee responds that the 1968 General Order does not apply to the Supply Contracts; that application of the 1968 General Order to the Supply Contracts would be unconstitutional; that the LPSC has in fact approved the Supply Contracts; and that a contract should not be declared void as against public policy unless certain requirements are met.

---

1. Trustee's Disclosure Statement, at p. 7.

2. Trustee's Disclosure Statement, at p. 10.

### 1. The Supply Contracts, the 1968 General Order, and the DRA

As observed hereinabove, although the LPSC did not originally review and approve the Supply Contracts in 1976, it ostensibly did so in 1990 when the amendment extending the term of the Supply Contracts through 2026 was approved in connection with its consideration of the DRA. The court finds it inconceivable to conclude that the LPSC would have considered extending the Supply Contracts an additional 5 years while at the same time not giving its tacit, if not express, approval to the base contracts.

The Plaintiffs take the position, however, that the approval of the Supply Contracts in 1990 did not remedy the problem because the Supply Contracts were absolutely null and thus not susceptible of being ratified. "A contract that is absolutely null may not be confirmed." La.Civ.Code art.2030.

■ The Trustee argues that the subsequent approval by the LPSC did not constitute a prohibited ratification of an absolutely null contract, but rather a waiver or remedial action by the very body that adopted the 1968 General Order. The Trustee's position is sound. Assuming for argument's sake that the 1968 General Order was a rule of public policy applicable to the Supply Contracts, the execution of those contracts without LPSC approval in 1976 was in violation of the 1968 General Order. The court, however, has determined that the LPSC clearly ratified the execution of the Supply Contracts when it subsequently approved the five-year extension of the Supply Contracts as part of its approval of the DRA between Cajun and the REA in 1990[3]. As the LPSC was the entity which established the public policy, *i.e.*, passing the 1968 General Order, the court concludes that the LPSC has the authority to determine the limitations of that policy as well as establishing exceptions to the policy.

For these reasons, the court need not determine the issue of whether applying the 1968 General Order to invalidate the Supply Contracts would be unconstitutional. The

court analogizes the instant situation to a basic rule of statutory construction—that which requires a court "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989).

Since the court has determined that the actions of the LPSC in 1990 resulted in a ratification of the execution of the Supply Contracts, the issue of whether the Supply Contracts are subject to the 1968 General order is moot, and, accordingly, the court need not consider the constitutional issue raised by the Trustee.

### 2. Prerequisites of Declaring a Contract Void as Against Public Policy

■ The general rule in Louisiana is that "courts will not declare a contract void as against public policy in the absence of express legislation or constitutional prohibition or a clear showing that the purpose of the contract contravenes good morals or public interest." *Meinerz v. Treybig,* 245 So.2d 557 (La.Ct.App.1971), *writ refused,* 258 La. 580, 247 So.2d 395 (1971).

■ There has been no allegation that the Supply Contracts violate the public interest. In fact, Cajun and the Members have been operating under the Supply Contracts for more than 20 years. The LPSC has made no effort to nullify the Supply Contracts as being against the public interest. There has been no argument that nullification of the Supply Contracts will benefit the public interest. In fact, in the two memorandum submitted by the LPSC, counsel for the LPSC did not even address the issues raised in Counts 1 and 2 of the Members Complaint.

The court finds that the Supply Contracts do not violate the public interest and therefore are valid and binding contracts between the Debtor and each Member who has executed such contract.

---

3. Valley, Washington–St. Tammany and Claiborne did not amend their contracts in 1990.

Accordingly, this holding cannot apply to them.

Accordingly, the Plaintiffs' Motion for Summary Judgment with regard to Counts I and II is **DENIED;** the Defendants' Motion for Summary Judgment with regard to Counts I and II is **GRANTED.**

## IV. EXECUTORY CONTRACT ISSUES

### A. ASSUMPTION/ASSIGNMENT OF THE SUPPLY CONTRACTS (COUNTS IV AND V)

#### 1. Section 365(a)

Section 365(a) provides a mechanism whereby executory contracts and unexpired leases may be either assumed or rejected by a trustee:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

■ In enacting the Bankruptcy Code, however, Congress in its wisdom chose not to define the term "executory contract." The legislative history and an overwhelming majority of the courts addressing the issue, however, support the definition of Professor Vern Countryman that an executory contract is—

a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn.L.Rev. 439, 460 (1973).

The Supreme Court inferred its approval of this definition in the case of *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), wherein, at footnote 6, the court declared:

The Bankruptcy Code furnishes no express definition of an executory contract, see 11 U.S.C. § 365(a), but the legislative history to § 365(a) indicates that Congress intended the term to mean a contract "on which performance is due to some extent on both sides." H.R.Rep. No. 95–595, p. 347 (1977), see S.Rep. No. 95–989, p. 58 (1977) [U.S.Code Cong. & Admin. News (1978) pp. 5787, 5844, 6303].

The Fifth Circuit has adopted the Countryman definition declaring that "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Murexco Petroleum, Inc.,* 15 F.3d 60, 62–63 (5th Cir.1994). *See, also, Stewart Title Guaranty Co. v. Old Republic National Title Insurance Co.,* 83 F.3d 735, 741 (5th Cir.1996).

■ No party in interest contends that the Supply Contracts are anything other than executory contracts subject to the provisions of section 365. All parties have focused on the issue of whether those contracts may be assumed and/or assigned by the Trustee. Accordingly, the court holds that the Supply Contracts are executory contracts within the meaning of section 365, as both parties to each contract have significant performance obligations, the failure of which would excuse the other party from performance.

#### 2. Law of the Case and Collateral Estoppel

Prior to addressing the substantive section 365 issues raised by the parties, the court must address the applicability of the doctrines of law of the case and collateral estoppel. The Trustee contends that these doctrines bar the Members from arguing that the Supply Contracts cannot be either assumed or assigned.

##### a. Law of the Case

■ Law of the case is a rule of practice under which a rule of law by a federal court establishes a precedent for subsequent proceedings involving the same issue in the same case. *Morrow v. Dillard,* 580 F.2d 1284 (5th Cir.1978). The Fifth Circuit most recently restated the applicability of the doctrine in *United States v. Becerra,* 155 F.3d 740, 752 (5th Cir.1998):

"Under the 'law of the case' doctrine, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Illinois Cent. Gulf R.R. v. International Paper Co.,* 889 F.2d 536, 539 (5th Cir.1989). This self-imposed doctrine "serves the practical goals of encouraging finality of litigation and discouraging 'panel shopping.'" *Id.* at 539; *see also Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 662 (5th Cir.1974). "It is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members.'" *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967) (*quoting Roberts v. Cooper,* 61 U.S. (20 How.) 467, 481, 15 L.Ed. 969 (1857)).

In his ruling on the motion to appoint a trustee, and after determining that a trustee should be appointed, Judge Polozola declared:

The Court finds that the following arguments made by Cajun and the other parties which oppose the appointment of a trustee have no basis in fact or law:

(1) A trustee cannot assume and assign the All–Requirements Contracts.[fn]

*In re Cajun Elec. Power Co-op., Inc.,* 191 B.R. 659, 663 (M.D.La.1995). In the footnote accompanying the quoted language the Court added that

It is clear that Cajun's obligations under these contracts do not require a special skill or qualification, nor does these contracts impose a strictly personal obligation on Cajun. In fact, Cajun's members receive much of their power directly from CLECO, GSU, and others under interconnection agreements.

*Id.,* at 663 n. 10.

Based upon this language, the Trustee takes the position that the law of the case doctrine prohibits this court from ruling upon the assumability and assignability of the Supply Contracts, arguing that this issue has been already determined by the District Court. The Trustee also argues that the Fifth Circuit, by not addressing the Supply Contracts, implicitly affirmed the District Court's comment regarding their assumability and assignability. The Trustee contends further that a finding that the Supply Contracts were assumable and assignable was necessarily implied by the Fifth Circuit's decision to appoint a trustee.

In the *Becerra* case, the Fifth Circuit indicated that the law of the case doctrine is not a rigid rule to be blindly followed in each and every instance:

The law of the case doctrine, however, is not inviolate. We have explained that "a prior decision of this court will be followed without re-examination ... unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *North Mississippi Communications, Inc. v. Jones,* 951 F.2d 652, 656 (5th Cir.1992); *see also City Pub. Serv. Bd. v. General Elec. Co.,* 935 F.2d 78, 82 (5th Cir.1991); *Lyons v. Fisher,* 888 F.2d 1071, 1074 (5th Cir.1989); *Daly v. Sprague,* 742 F.2d 896, 901 (5th Cir.1984).

155 F.3d at 752.

 The evidence on the trial of whether the court should direct the appointment of a trustee did not involve the issue of the assumability or assignability of the Supply Contracts as executory contracts—those issues were not presented to either the District Court or to the Fifth Circuit for decision. The parties obviously did not have an opportunity to litigate that issue fully during the proceedings to appoint a trustee. The issue was never presented properly to the District Court, and this court believes, with due respect, that the Court's extremely limited comments in its prior opinion were *dicta.* The Fifth Circuit's opinion does not address the issue, and clearly was not necessary to that Court's decision. Thus, based upon the foregoing, the court determines that the doctrine of law of the case is inapplicable.

**b. Collateral Estoppel**

Based upon the same reasoning raised regarding the doctrine of law of the case, the

Trustee contends that collateral estoppel also bars this court's re-examination of the assumability and assignability of the Supply Contracts.

 Collateral estoppel is a form of issue preclusion that applies when certain requirements are met. *U.S. v. Shanbaum,* 10 F.3d 305, 311 (5th Cir.1994); *Universal American Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1136–37 (5th Cir.1991); *Moch v. East Baton Rouge Parish School Board,* 548 F.2d 594, 596 (5th Cir.) *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977). In order for collateral estoppel to apply, the party relying thereon must establish the following four elements:

1. The issue under consideration must be "identical" to the issue previously litigated;

2. The issue must have been "fully and vigorously" litigated in the prior proceeding;

3. The prior determination of the issue was "necessary for the judgment" in that proceeding; and

4. No special circumstances exist that would render preclusion inappropriate or unfair.

*Parklane,* 439 U.S. at 326–32, 99 S.Ct. at 649–52; *Shanbaum,* 10 F.3d at 311; *Universal American Barge,* 946 F.2d at 1136; *Moch,* 548 F.2d at 596.

 Taking into consideration the above discussion with regard to the non-applicability of law of the case doctrine, and for the following reasons, the court also concludes that collateral estoppel does not apply under the facts of the instant case:

—the issues of assumability and assignability of the Supply Contracts as executory contracts were not presented to either the District Court or the Fifth Circuit on the motion to appoint a trustee;

—the issues of assumability and assignability of the Supply Contracts as executory contracts were not "fully and vigorously" litigated in the proceedings to appoint a trustee.

—the determination of the assumability and assignability issues was not required to appoint the Trustee.

Accordingly, the court holds that neither the doctrine of law of the case nor the doctrine of collateral estoppel bar this court from making a determination as to whether the Supply Contracts may be assumed or assigned as executory contracts pursuant to the provisions of section 365.

### 3. Section 365(c) and (f)

The Members argue that the Supply Contracts are neither assumable nor assignable without the consent of both the Members and the LPSC, while the Trustee obviously takes the position that the consent of neither is required. This dispute requires an examination of an apparent conflict in sections 365(c) and section 365(f).

Subject to the limitations imposed by subsections (b), (c) and (d) thereof, section 365(a) recognizes a trustee's authority to *assume* an executory contract, subject, of course, to court approval. With certain qualifications, section 365(f) authorizes a trustee to *assign* an executory contract that has been assumed:

(f)(1) *Except as provided in subsection (c)* of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection; .... (Emphasis added.)

The exception in section 365(c) relevant in the instant case provides that:

(c) *The trustee may not assume or assign* any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) *applicable law* excuses a party, other than the debtor to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) Such party does not consent to such assumption or assignment;.... (Emphasis added.)

The Trustee argues that the issue of *assignment* never arises because the Trustee's Plan calls only for the *assumption* of the Supply Contracts and not their assignment. The Members take the position, however, that the treatment of the Supply Contracts in the Trustee's Plan constitutes a *de facto* assignment of the Supply Contracts. The court believes that the issue of whether the treatment of the Supply Contracts in the Trustee's Plan constitutes an assignment requires a determination by the court of material facts which are in dispute. For that reason, the court did not grant summary judgment on the issue of whether the Trustee's Plan calls for an assignment of the Supply Contracts.

### a. "Separate Entity" Theory

The Trustee argues that Congress intended section 365(c) to place certain limitations on the assignment of executory contracts to third persons, but did not intend section 365(c) to prohibit assumption of executory contracts by the debtor or debtor-in-possession. This issue has created some divergent results in the jurisprudence.

An early case dealing with this issue is *In re West Electronics, Inc.*, 852 F.2d 79 (3rd Cir.1988), in which the Third Circuit held that section 365(c) requires the court to conduct a hypothetical test to determine if the debtor in possession may assume and assign an executory contract. The court opined that whether the debtor is proposing to assume the contract or whether the contract is being assigned is irrelevant, observing that "the relevant inquiry is not whether [applicable law] would preclude an assignment from West as a debtor to West as a debtor in possession, but whether it would foreclose an assignment by West to (a third party)." 852 F.2d at 83. Thus, under the analysis of *West*, if nonbankruptcy law precludes *assignment* to a third party, section 365(c) operates to preclude *assumption* by the debtor, even though the debtor did not seek to assign the contract.

While the *West* decision has some support, the majority of cases considering this issue have rejected its "hypothetical test" and have held that section 365(c) does not prohibit assumption by the debtor in possession. *See, e.g., Texaco, Inc. v. Louisiana Land & Exploration Co.*, 136 B.R. 658 (M.D.La.1992), and *In re Lil' Things, Inc.*, 220 B.R. 583 (Bankr.N.D.Tex.1998).

In *Texaco*, the Court criticized the reasoning of *West*, stating that it was directly contrary to the view expressed by the Supreme Court in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), that the debtor in possession is the same entity as the prepetition debtor. The court in *Texaco* concluded that Congress did not intend section 365(c)—

> to bar an assumption of a contract by a debtor in possession simply because there is a statute that conditions transfers to third persons upon approval of the nondebtor party.

136 B.R. at 670.

The court in *Lil' Things* recognized that most courts have rejected *West*'s "separate entity" theory "and have criticized West Electronic's conclusion that a debtor in possession is somehow different from the prebankruptcy contracting party and can be prevented from assuming its contracts by § 365(c)." 220 B.R. at 586.

The holdings by the courts in *Texaco* and *Lil' Things* represent the only logical conclusion that can be reached. If the court were to adopt the rationale of *West* and focus primarily upon assignability, a chapter 11 filing would have the virtual effect of rejecting executory contracts covered by section 365(f). As suggested by the court in *Texaco*, this analysis would extend section "365(c) beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's enterprise." *Ibid.*

The court concludes that section 365(c) does not operate to preclude the Trustee from seeking to assume the Supply Contracts on the basis of the reasoning set forth in *West*.

### b. Conflict Between Sections 365(c)(1) and 365(f)?

At first blush sections 365(c) and 365(f) present a conflict—section 365(c)(1) prohibits assumption and assignment of executory contracts where applicable law excuses the nonconsenting nondebtor party from accepting performance from an entity other than the debtor, while section 365(f)(1) recognizes the trustee's authority to assign executory contracts notwithstanding a provision in applicable law that prohibits or restricts such assignment.

■ After extensive analysis, the court in *Lil' Things* suggests that there is no conflict between the sections:

> After an in-depth review of all of the circuit court decisions and most of the district and bankruptcy court decisions in this area, and keeping in mind that a statute should not be read in a vacuum, but should be construed in a way that gives meaning and effect to all its provisions, this Court finds that § 365(f)(1) states the general rule that a trustee or debtor in possession may assign an executory contract notwithstanding "applicable law" that prohibits assignment, while § 365(c)(1)(A) represents an exception to that rule where applicable law protects the right of the non-debtor contracting party to refuse to accept from or render performance to an assignee, and does not apply to general prohibitions on assignments.

220 B.R. at 590–591.

■ Judge Abramson then went on to explain the rationale for this distinction:

> This outcome is also consistent with the basic rationale behind § 365 as a whole: giving debtors the ability to assign their valuable leases and contracts, while offering some protection to the third parties with which they have contracted. Pursuant to §§ 365(a) and (f) a debtor's contracts and leases are generally assumable and assignable, because these are some of the most valuable assets of most bankruptcy estates. If this were not the rule, it would thwart one of the Code's basic underlying goals of maximizing value for the creditors of the bankruptcy estate. How-

ever, § 365(c)(1)(A) acts to balance the rights of third parties who contracted with the debtor and whose rights may be prejudiced by having the contract or lease performed by an entity with which they did not enter into the agreement. This right becomes paramount, under § 365(c)(1)(A), where the identity of the party rendering performance under the contract is material to the contract, and the contract is nondelegable under applicable non-bankruptcy law.

This court adopts the reasoning of the above-quoted language from *Lil' Things*, and now must then consider whether "applicable law" operates to safeguard the right of the non-consenting non-debtor parties to the Supply Contracts to refuse to accept performance from an entity other than Cajun.

### c. Applicable Law

No one disputes that since the Supply Contracts were executed in and have been and will be performed in Louisiana, Louisiana law provides the "applicable law" for purposes of section 365(c)(1)(A). Consequently, if the Supply Contracts are of the type that cannot be assigned under Louisiana law, they may not be assumed and assigned in a bankruptcy case.

La.Civ.Code art.1984 provides:

> Rights and obligations arising from a contract are heritable and assignable unless the law, the terms of the contract or its nature preclude such effects.

Thus, it would appear that the law of Louisiana would permit the assignment of the Supply Contracts unless precluded by (i) the "law", (ii) the terms of the contract, or (iii) the nature of the contract. As the terms of the Supply Contracts do not specifically prohibit their assignment, the court need not consider whether section 365(f)(1) would invalidate such prohibition. The Members suggest that, when considered together, the Elec. Coop. Law, Louisiana Civil Code, LPSC General Orders and the "nature" of the Supply Contracts preclude their assignment.

### (i) The "law"

#### (a) Section 421, Elec. Coop. Law

Section 421 of the Elec. Coop. Law provides:

A cooperative may not sell, mortgage, lease or otherwise dispose of or encumber all or any substantial portion of its property unless such sale, mortgage, lease or other disposition or encumbrance is authorized at a duly held meeting of the members thereof by the affirmative vote of not less than a majority of all of the members of the cooperative. However, notwithstanding anything herein contained, or any other provisions of law,

(1) The board of directors may sell, lease, or otherwise dispose of all or a substantial portion of such property to another cooperative authorized to transact business in the state pursuant to this Part upon the authorization of a majority of those members of the cooperative present at a duly held meeting of the members thereof.

The Members claim that section 421, when read in conjunction with the decision of the Fifth Circuit in *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir.1983), constitutes "law" which prohibits the assignment of the Supply Contracts without the consent of the non-debtor parties to such contracts.

In the *Braniff* case, Braniff Airways, the debtor, had leased space at National Airport in Washington, D.C. The FAA was the lessor, and thus a party to the contract at issue. The debtor proposed to assume and assign the lease to PSA Airlines pursuant to a section 365 motion rather than as part of a plan of reorganization. The bankruptcy court approved the transaction over the objection of another airline.

The district court affirmed, but the Fifth Circuit reversed, first observing that the lower courts erred in holding that section 365(c)(1) applied only to "personal services" contracts:

Nothing in the statute authorized the district court to depart from the express language of § 365(c), which provides for its application to unexpired leases and belies any limitation to personal service contracts.

700 F.2d at 943.

The Court then held that applicable law [4]
—

provides that the FAA is to control the leasing of space at National Airport and that no person may operate at National Airport without its approval. Since PSA has not been approved to operate at National Airport, § 365(c) excuses the FAA from accepting performance from PSA.

*Ibid.*

The crux of *Braniff* was the assumption *and* assignment of the airport lease. Section 365(c), upon which the Committee heavily relies, addresses the much narrower question whether "applicable law" excuses the non-debtor party from accepting performance from one other than the debtor unless the non-debtor consents. *Id.* at 696. The applicable law in *Braniff* reserved to the FAA the absolute power to decide *who* would be permitted to lease airport space; that is, the statute expressly put in issue the identity of the performing party. Section 421, on the other hand, is no more than a plain vanilla restriction on the assignment of assets, and does not constitute a legislative statement concerning whether a non-consenting contracting Member is excused from accepting electricity from a party other than Cajun. Section 421 yields no indication that the identity of the power supplier to the Members is material.

 Unlike the case in *Braniff,* Louisiana law does not require the contracting Member to approve the identity of the parties to the Supply Contracts. The *Braniff* statute expressly contemplated a lease, while the Louisiana law upon which the Committee relies simply forbids transfer of assets absent majority vote, which majority may or may not include the contracting Member whose Supply Contract is being transferred. Because the statute allows asset dispositions based

---

4. 7 D.C.Code §§ 1101–1107, and 14 C.F.R. § 159.91(a).

only on majority—not unanimous—vote, section 421 acknowledges that property may be transferred over any particular Member's objection. This result belies any notion that the identity of the party providing power under the Supply Contracts is a critical issue, or that the Member whose interest is being transferred must consent to a change in the other contracting party. Accordingly, the court holds that section 421 is not the type of "law" contemplated by La.Civ.Code art.1984 so as to bar assignment of the Supply Contracts.

### (b) Louisiana Law of Obligations

The Members also argue that the Louisiana law of obligations bars assignment. La. Civ.Code art. 1756 provides:

> An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something.

Revision Comment (c) to art. 1756 recognizes that in the case of reciprocal obligations, such as exist under the Supply Contracts, the parties are reciprocally obligors and obligees.

The Civil Code further classifies obligations as either real [5], heritable [6], or strictly personal [7]. The Fifth Circuit has recognized that, under Louisiana law,

> ... a real right attaches to the property (movable or immovable) and is automatically transferred to a subsequent successor in interest to the property. The transferability of a personal obligation, in contrast, depends on whether the obligation is classified as "heritable" or "strictly personal."

*Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 756 (5th Cir.1994).

■ A heritable obligation is one which may be transferred to another person. La.Civ.Code art. 1765. An obligation is strictly personal if "performance can be enforced only by the obligee, or only against the obligor." La.Civ.Code art. 1766; *Landry*

*v. Landry*, 516 So.2d 217, 218 (La.App. 4th Cir.1987). Strictly personal obligations include those obligations that require special skill or qualification. Every obligation, however, is deemed heritable—and thus assignable—unless the terms or the nature of the contract indicates otherwise. La.Civ.Code arts. 1765.[8]

■ The Supply Contracts clearly do not create a real obligation within the meaning of article 1763. The next inquiry is whether the obligations created by the Supply Contracts are to be classified as either heritable or strictly personal? Having read relevant portions of the Supply Contracts, and considering the dictates of articles 1765 and 1766, the court concludes that the Supply Contracts contain heritable obligations rather than strictly personal obligations, and, therefore, the Louisiana law of obligations does not operate to trigger non-assignability under section 365(c)(1).

### (ii) The "nature" of the Supply Contracts

As stated earlier, the Supply Contracts contain no anti-assignment provisions. In fact, Cajun's Bylaws permit the Supply Contracts to be assigned upon the vote of either a majority, or in other circumstances, two-thirds of the Members. *See,* Bylaws at Article VII. Indeed, a Supply Contract may be assigned without the particular Member's consent, provided that a majority, and in some cases, two-thirds, of the Members so vote.

■ The Supply Contracts are nothing more than commercial contracts between two sophisticated entities, pursuant to which Cajun has two duties. First, Cajun must supply electricity to the Members, for which the Members must pay. Furnishing electricity is not a personal duty. Cajun also has a duty to set rates. This is not a personal obligation. Any party who assumes the contracts will be required to follow the detailed rate-setting procedure set forth therein. By

---

5. La.Civ.Code art. 1763.

6. La.Civ.Code art. 1765.

7. La.Civ.Code art. 1766.

8. Note the almost identical language contained in both articles 1765 and 1984.

law, electricity rates are subject to regulatory authority. Thus, the rate-setting process itself only reinforces the notion that there has never been anything "strictly personal" about the setting of rates. Accordingly, there is nothing regarding the "nature" of the Supply Contracts which prohibits their assignment.

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment with regard to Count IV is **DENIED,** and the Defendants' Motion for Summary Judgment with regard to Count IV is **GRANTED.**

### 4. Consent of the LPSC (Count V only)

The LPSC General Order dated March 18, 1994, which the Members allege also constitutes "applicable law" under section 365(c), provides in relevant part that:

> No utility ... subject to the jurisdiction of the Louisiana Public Service Commission shall ... assign ... any part of its franchise, works, property, or system ... nor transfer ... ownership of any of the assets ... to any other person ... where the values involved in such action exceed one percent (1%) of the gross assets of such regulated utility ..., without prior full disclosure of the prior intendment and plan of such utility ... with regard to such action and without prior official action of approval or official action of non-opposition by the Louisiana Public Service Commission.

Relying upon this General Order, both the Members and the LPSC argue that section 365(c)(1) prohibits the assumption and assignment of the Supply Contracts without the consent of the LPSC. They assert that the LPSC's 1968 General Order provides the "applicable law" which prohibits assumption and/or assignment.

 The court need not address the issue of whether the 1968 General Order constitutes applicable law as section 365(c)(1) on its face does not require LPSC consent for the assumption or assignment of the Supply Contracts. Section 365(c)(1) only prohibits assumption or assignment if applicable law excuses a *party* to the contract from accepting performance from or rendering performance to an entity other than the debtor or debtor-

in-possession. In the instant case, the LPSC is not a party to the Supply Contracts, and accordingly, section 365(c)(1) does not apply.

Again, the Members and the LPSC rely heavily on the *Braniff* case to support their argument that section 365(c) requires LPSC consent as a condition to the assumption or assignment of the Supply Contracts. Their reliance on *Braniff,* however, is misplaced. In *Braniff,* the debtor sought to assume and assign a lease between the debtor and the FAA. The Fifth Circuit noted the proposed assignment would violate section 365(c)(1) because applicable law, FAA regulations, "excuses the lessor from accepting performance from the assignee." 700 F.2d at 943. Because the FAA, as lessor, did not approve the assignment, the assignment was invalid under section 365. *Braniff* did not involve a situation in which third party regulatory approval was sought. Rather, *Braniff* applied a federal law that protected the non-debtor party to the contract. That party happened to be the FAA. *Braniff* does not stand for the proposition that section 365(c) grants a regulatory agency that is not a party to an executory contract authority to block an assignment of that contract.

The LPSC is not a "party" in the phrase "applicable law excuses a party" in section 365(c)(1)(A). The consent of the LPSC, therefore, is not a prerequisite to the assumption or assignment of the Supply Contracts.

The Plaintiffs' Motion for Summary Judgment is **DENIED** as to Count V. Defendant's Motion for Summary Judgment is **GRANTED** as to Count V.

### B. ASSUMPTION OR ASSIGNMENT MUST INCLUDE ALL PROVISIONS OF SUPPLY CONTRACTS (COUNT VI)

In Count VI, the Members seek a declaratory judgment that any assumption or assignment of the Supply Contracts must include all provisions of the Supply Contracts, as well as a ruling that certain other provisions, not within the four corners of the Supply Contracts, were nonetheless to be deemed included therein.

### 1. Summary Judgment

■ Well-established bankruptcy law provides that—

An executory contract may not be assumed in part and rejected in part. The trustee must either assume the entire contract, *cum onere,* or reject the entire contract, shedding obligations as well as benefits.

3 Collier on Bankruptcy, ¶ 365.03[1], p. 365–22 (15th ed. revised).

The rule that an executory contract must be assumed or assigned *in toto* has been recognized on several occasions by the Fifth Circuit. *See, e.g., Stewart Title Guaranty Company v. Old Republic National Title Insurance Company,* 83 F.3d 735 (5th Cir. 1996), and *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1984).

While the court agrees that an executory contract must be assumed or assigned in its entirety, the court was not willing to determine in a motion for summary judgment that other provisions, foreign to the Supply Contracts, must be deemed to be included therein, and, thus, must be assumed. Accordingly, both Motions for Summary Judgment with regard to Count VI were **DENIED.**

### 2. On the Merits

Recognizing the well-established principles set forth above, the Trustee does not (and cannot) dispute that assumption of the Supply Contracts under section 365 requires that all provisions of those contracts be assumed [9]. The Members contend, however, that the following provisions, *extrinsic* to the four corners of the Supply Contracts, must be deemed to be a part thereof: (1) that the Members have the contractual right to elect Cajun's board of directors; (2) that Cajun's board of directors, elected by the Members, has the right to set rates; (3) that Cajun may not earn a profit; and (4) that LPSC jurisdiction and Louisiana regulatory law are part of the Supply Contracts.

Section 4(b) of the Supply Contracts contains language relating to rate setting and profits. Based upon the general principles of assumption under section 365, the Trustee's proposal to assume the Supply Contracts brings with it all of the benefits and burdens of such contracts. Thus, to the extent that section 4(b) places burdens or limitations with respect to rate setting and profits, those matters continue in effect subsequent to assumption of the Supply Contracts. The court, however, will not extend the specific language of the Supply Contracts to include extrinsic provisions which might suggest different interpretations or results.

■ On the other hand, the Supply Contracts are silent with respect to board election and LPSC jurisdiction. Nonetheless, the Members want the court to conclude that the Supply Contracts should be engrafted with provisions granting the Members the right to elect Cajun's board and making all rate changes subject to LPSC jurisdiction. Assumption of the Supply Contracts under section 365, however, neither mandates nor permits such expansion.

Although the Elec. Coop. Law and/or the Cajun Bylaws may require Cajun's board to be elected by the Members, these provisions are extrinsic to the Supply Contracts. The court has not been made aware of any authority, and indeed does not believe any such authority exists, which would make such provisions a part of the Supply Contracts. If, in the final analysis, applicable law requires the Members to elect the Cajun board, then that will be found to be the case. That circumstance, however, does not permit the court to declare that these extra-document provisions are somehow brought into the document by virtue of an assumption under section 365.

The same conclusion must follow with respect to LPSC jurisdiction. If such jurisdiction exists, it exists. And it exists regardless of whether the Supply Contracts are assumed or rejected. Assumption does not change this fact.

Accordingly, with respect to Count VI, the court will grant judgment recognizing the general rule, *i.e.,* that assumption of the Supply Contracts results in the entirety of those

---

9. No suggestion was made that the Supply Contracts contain multiple contracts which may be severable, as was the case in the *Stewart Title* case.

contracts being assumed, which assumption includes the liabilities, restrictions and limitations as well as the benefits. The court, however, denies the request of the Members that there be judgment recognizing as a part of the Supply Contracts any provision extrinsic thereto.

## C. BYLAWS AS EXECUTORY CONTRACTS
### (COUNT VIII)

In Count VIII of the complaint, the members ask the court to declare that Cajun's Bylaws are an executory contract which must be included in any assumption or assignment of the Supply Contracts.

The Trustee argues that Count VIII fails to state a justiciable controversy as the Trustee has yet to seek amendment to the Bylaws. The court finds that Count VIII does present a justiciable controversy and will therefore address whether the Bylaws are an executory contract.

The Members assert the following obligations running between Cajun and the Members:

—the Members are required to purchase electricity from Cajun at rates set by Cajun's board of directors;

—Cajun is required to operate on a cooperative nonprofit basis for the benefit of the Members.

■ Certainly, the Bylaws creates rights and liabilities for both the Members and Cajun. While the Bylaws do have legal stature of some sort, they are not an executory contract within the meaning of section 365. And just as the court would not conclude that assumption of the Supply Contracts results in extrinsic matters being "deemed assumed," the court will not conclude that assumption of the Supply Contracts requires an assumption of the Bylaws. In other words, the court refuses to hold that the violation of one of the Bylaws by either Cajun or the Members would constitute a material breach of the Supply Contracts, thereby excusing the performance of the other party.

The Plaintiffs' Motion for Summary Judgment as to Count VIII is **DENIED.** The Defendant's Motion for Summary Judgment as to Count VIII is **GRANTED.**

## V. THE TRUSTEE'S "G & T SCHEME" (COUNT VII)

### A. Summary Judgment

Count VII raises the issue of the legal consequences of the specific treatment of the Supply Contracts in the Trustee's Plan, referred to by the Members as the "G & T Scheme". The issues raised by Count VII involve material issues of fact which remain in dispute between the parties. Accordingly, the court denied both the Plaintiffs' and Defendant's Motions for Summary Judgment as to Count VII.

### B. On the Merits

In Count VII of the Complaint, the Plaintiffs request the court render declaratory judgment with regard to three issues, namely: (1) whether the Trustee's Plan constitutes a modification of the Supply Contracts without the Members' consent; (2) whether the Trustee's Plan constitutes a *de facto* assignment of the Supply Contracts without the Members' consent; and (3) whether the Trustee's Plan constitutes a *de facto* assignment of the Supply Contracts without the LPSC's consent.

(1) *Assignment Of The Supply Contracts Without Consent of Members and LPSC.*

In Section IV of these reasons, under the title **EXECUTORY CONTRACT ISSUES,** the court addresses the issue of the nonconsensual assumption and assignment of the Supply Contracts. For the same reasons set forth there, the court concludes here that whether the Trustee's Plan constitutes a *de facto* assignment without the consent of either the Members or the LPSC is immaterial—section 365(c)(2) does not require such consent for either assumption or assignment of the Supply Contracts.

(2) *The Trustee's Plan Modifies the Supply Contracts.*

This succinctly presents the consummate issue of the Complaint, namely, whether the Trustee's Plan constitutes an impermissible nonconsensual modification of the Supply Contracts. This issue is the crux, the quintessence, the heart of the Plaintiffs' dispute with the Trustee's Plan.

(a) *Although the Trustee's Plan Attempts to Preserve Cajun's Cooperative Structure, the Nature of the Trustee's Plan Destroys the Theory Underlying the Reason for Cooperatives.*

Under the Trustee's Plan, Reorganized Cajun will not function as a cooperative as was expected or intended by the Plaintiffs. Reorganized Cajun will not function to advance the mutual economic interests of its members. Economies of scale and advantages of load diversity will not be realized.[10] The Trustee's energy economics expert, Michael D. Yokell, Ph. D., acknowledged that it is neither normal nor customary for a G & T(a) to be bound to a supply contract that was negotiated without the members' participation or their evaluation of its economic options,[11] or (b) to bind itself to a long-term contract that is not the most economic option available,[12] or (c) to impose services on its members that members do not want;[13] or (d) to enter into a 25–year contract that the members do not want.[14] Nonetheless, all of these occurrences will transpire under the Trustee's Plan.

Notwithstanding the vehement objections of the Plaintiffs, the Trustee's Plan effectively modifies the Supply Contracts in two fundamental ways. First, the Trustee's Plan obligates the Members to continue to purchase all their requirements from Generating through Reorganized Cajun while completely eliminating the Members' right to effectively control Cajun's operations, objectives, and philosophies.

The evidence clearly establishes, and the Trustee's own expert confirms, that there is a fundamental economic difference between the Members' ability to control Cajun when they entered into the Supply Contracts and their ability after bankruptcy.[15] This is obvious. One of Cajun's fundamental missions was to supply reliable and inexpensive power to its Members.[16] The Members' future obligations under the Supply Contracts will be significantly impacted by the decisions regarding the sale of Cajun's presently owned generating assets; whether Cajun will purchase power for resale and, if so, from whom, for what period and under what terms and conditions; and whether Cajun may look to other possible sources of electricity in the future.[17] Yet, the Members will have no control over Cajun's activities in this regard for the next 25 years.[18] All those actions and decisions will have been made by the Trustee. Neither the Members nor a Member-elected board negotiated either the 25–year, all-requirements nonconsensual PSSA or the Services Agreement; authorized the execution of those Agreements on behalf of Reorganized Cajun; authorized the sale of Cajun's assets; or authorized the encumbrances of the Supply Contracts.[19]

---

10. O'Sullivan, 11/14/97 at 203, 205; Tr. J. Williams, 1/12/98 at 134–35; Tr. Baron, 1/15/98 at 261–67.

11. Tr. Yokell, 1/28/98 at 139–40.

12. *Id.* at 140.

13. *Id.* at 141.

14. *Id.*

15. Yokell, 12/10/97 at 75–76, 88; Tr. Daniel, 1/13/98 at 104, 131; Tr. Baron, 1/16/98 at 68–69; Tr. Yokell, 1/27/98 at 311; Tr. Yokell, 1/28/98 at 134–35; Daniel Report, CCM Ex. 32, p. 9; Snowling Report, CCM Ex. 50, ¶ 10.

16. Tr. Mabey, 1/14/98 at 256; Tr. MacLeod, 1/27/98 at 36.

17. Daniel Report, CCM Ex. 32, pp. 8–9; Tr. Daniel, 1/13/98 at 104–05; Tr. Lewellen, 1/12/98 at 187; Tr. Mabey, 1/14/98 at 257; Tr. Baron, 1/15/98 at 258; Tr. MacLeod, 1/27/98 at 71–73; Tr. Yokell, 1/28/98 at 130–34.

18. Daniel Report, CCM Ex. 32, pp. 8–9; Tr. Yokell, 1/28/98 at 137.

19. Tr. Dykes, 1/13/98 at 18–19; Tr. O'Sullivan, 12/19/96 at 213–14; O'Sullivan, 1/14/97 at 186; Tr. Williams, 1/12/98 at 90–97; Tr. Tucker, 1/12/98 at 366–67; Tr. MacLeod, 1/27/98 at 36, 141.

Secondly, the Trustee's Plan modifies the pricing terms of the Supply Contracts. The Trustee's Plan does not adopt the rates provided for under the Supply Contracts, but rather mandates the "rates" to include "the costs for the purchase of power under the [PSSA]."[20] The "rates" referred to are the prices to be charged the Members by Reorganized Cajun (and are not the revenues received from selling electricity at those rates), and the "costs" are simply the prices paid Generating by Reorganized Cajun. By requiring that the prices paid by the Members must include the prices paid by Generating, the Trustee modifies the pricing terms of executory contracts which he purports to assume by replacing the pricing terms with those specified in the PSSA.

■ Democratic control by the members is a fundamental principle of being an electric cooperative.[21] An expert called by the Trustee, Mr. James Smith, testified as to what is required in order for an entity to be operating on a cooperative basis. Mr. Smith agreed with the following definition of a cooperative:

> A democratic organization of persons organized to furnish themselves an economic service under a plan that eliminates entrepreneur profit and provides for substantial equality of control and ownership.[22]

Unlike a for-profit entity which exists to make profits on sales to its customers, Cajun, like any cooperative, exists solely to provide mutual benefits to its member-customers and is to be managed on that basis.[23] The Trustee's own expert witnesses testified that distribution cooperatives form G & Ts to serve their mutual economic interests by achieving economies of scale and scope or to take advantage of load diversity, and that a G & T's "reason for being" is to "provide a reliable source of power [to its members] at the lowest possible cost."[24] The Trustee's own experts also acknowledge that, in furthering the G & T's basic objectives, the distribution cooperatives would evaluate the various economic options and then act on what they believed would best serve the Members' interests.[25]

The evidence establishes that no rational economic justification exists to have a cooperative which is under the control of someone other than members;[26] for a G & T to be bound to contract terms the members do not want;[27] for a G & T to be a power supplier when the cooperative's members are not obtaining power on more favorable terms than they could otherwise;[28] or to have a G & T that is not advancing the members' mutual economic interests.[29]

Under the Trustee's Plan, the cost of electricity will be controlled not by the board of directors, but by Generating, the party supplying electricity to Reorganized Cajun. The role of the board will be to accept the bill and assess it to the Members. The Members will have no ability to control their own costs, exercise economic options, or otherwise direct their destiny. This result eliminates the reason to enter the contracts in the first place.[30]

■ The court finds that the natural effect of the Trustee's Plan results in an improper modification of the Supply Contracts.

---

**20.** Trustee's Third Amended and Restated Plan of Reorganization Dated November 8, 1996, as Modified as of March 18, 1998, Art. VII, § 7.4(e).

**21.** *Id.* at 40.

**22.** Tr. Smith, 3/19/98 at 33–34.

**23.** Lewellen Report, CCM Ex. 31, pp. 2,3; Daniel Report, CCM Ex. 32, p. 5; Snowling Report, CCM Ex. 50, ¶ 4; Tr. Williams, 1/12/98 at 117; Tr. Tucker, 1/12/98 at 351–54; Tr. Lewellen, 1/13/98 at 183–84, 202; Tr. MacLeod, 1/27/98 at 27; Tr. Yokell, 1/28/98 at 128.

**24.** Tr. Yokell, 1/28/98 at 128; Tr. Smith, 3/19/98 at 35.

**25.** Tr. Yokell, 1/28/98 at 130.

**26.** Tr. Lewellen, 1/13/98 at 203.

**27.** *Id.* at 205.

**28.** Lewellen Report, CCM Ex. 31, pp. 3–4; Tr. Daniel, 1/13/98 at 101–02; Tr. Smith, 3/19/98 at 106; Tr. MacLeod, 1/27/98 at 82.

**29.** 1971 Louisiana Electric Cooperative, Inc. Annual Report, CCM Ex. 17, p. 4; Tr. Lewellen, 1/13/98 at 201–03.

**30.** *Id.* at 40.

**714**

The court has determined that the Trustee may assume and assign the Supply Contracts; however, in designing a plan which *inter alia* binds the Members for 25 years to treatment which they do not want and for which they did not contract, the Trustee has, in effect, achieved a result inconsistent with those jurisprudential directives denying the ability to modify such contracts.

(b) *Confirmation of The Trustee's Plan Will Result in a Failure of Cause under Louisiana Law.*

A direct result of the modification of the Supply Contracts resulting from confirmation of the Trustee's Plan would be the invalidation of the Supply Contracts based upon a failure of *cause* under Louisiana law.

■ Louisiana has long recognized the civil law principle know as "failure of cause". According to the law of civil obligations, there are four elements to a binding agreement: (1) capacity, (2) consent, (3) object, and (4) cause.

■ "Cause" is the reason why a party obligates himself.[31] Cause is the motive upon which a party based its decision to enter into a binding agreement. A contract may be invalidated for unilateral error of fact as to the motive or principal cause for entry into that contract.[32] In the event that the cause for which a party agreed to bind himself ceases to exist, the party's consent is vitiated, resulting in a failure of the obligation as a whole.[33] Louisiana has a substantial body of longstanding jurisprudence recognizing failure of cause as a basis for the invalidation of contracts.[34]

For the following reasons, the court concludes that the principal motive and cause for which each of the Members entered into the Supply Contracts with Cajun fails under the purposed treatment set forth in the Trustee's Plan.

Prior to their decision to create Cajun Electric, the electric distribution cooperatives across the state of Louisiana were required to purchase electricity from relatively unreliable sources and under terms not subject to negotiation. In the early 1960's, they decided to acquire more control over their own economic destiny. This decision ultimately led to the formation of Cajun. Cajun's genesis resulted from a desire to obtain the following: (1) fair treatment; (2) lower rates; (3) a source of generating capacity owned and operated by the distribution co-ops; (4) enjoyment of the benefits associated with load diversity and economies of scale; and (5) the usual benefits associated with a distributor who buys from a wholesale source over which it has control and authority. These elements constitute the principal cause or motive for the Members executing the Supply Contracts with Cajun.

■ Louisiana's law of obligations requires that the opposing party to a contract either know of the other contracting party's cause for entering the agreement, or alternatively, a showing that such knowledge would be reasonably expected under the circumstances. In this instance, logic dictates that Cajun was clearly aware of the Members' cause for executing the Supply Contracts. Such an inference is easily derived from a recognition of the fact that, as a cooperative, Cajun is an entity that is made-up of its members. Accordingly, it is without question that Cajun possessed the same knowledge that was held by the 12 members regarding the cause and motivation for executing those agreements.

---

**31.** LSA–C.C.Art.1967 (West 1998).

**32.** *Ouachita Equipment Rental, Inc. vs. Trainer,* 408 So.2d 930 (La.App. 2nd Cir.1981).

**33.** 5 La.Civ.Law Treat. (Litvinoff) S 16.76, 569 (1997).

**34.** *Carpenter v. Williams,* 428 So.2d 1314 (La. App. 3rd Cir.1983) (contract for sale of home invalidated where purchaser's cause for moving was eliminated); *Arena v. KMart Corporation,* 439 So.2d 528 (La.App. 1st Cir.1983) (contract for purchase of television rescinded due to uni-

lateral error regarding price); *Woodard v. Felts,* 573 So.2d 1312 (La.App. 2nd Cir.1991) (contract for professional services invalidated); *State Department of Transportation Development v. K.G. Farms, Inc.,* 402 So.2d 304 (La.App. 1st Cir. 1981); *Jefferson Truck Equipment Company, Inc v. Guarisco Motor Company, Inc.,* 250 So.2d 211 (La.App. 1st Cir.1971); *Ouachita Equipment Rental Company, Inc. v. Trainer,* 408 So.2d 930 (La.App. 2nd Cir.1981); *O'Neal v. Cascio,* 324 So.2d 539 (La.App. 2nd Cir.1975).

Under the Trustee's Plan, there is a failure of cause as it pertains to the Members' reason for entering into the Supply Contracts. The Members' primary motivation for entry into the Supply Contracts was to insure that the G & T, of which they were co-owners, obtained sufficient capacity to meet their power requirement needs and to enjoy those benefits reasonably expected to stem from one owning its own generating capacity.

Under the Trustee's Plan, the Members will not enjoy the benefits they expected to receive when the Supply Contracts were executed. First, Cajun will have no generating capacity under the Trustee's Plan, and is precluded from obtaining such capacity for 25 years. Second, the Members will have no meaningful control or input into the provider of its wholesale power. In the past, the Members were afforded directorship and meaningful input into the operation of their wholesale provider, whereas they will now be given seats on the board of a shell corporation that does not even have final authority over its own annual budget.

Third, the Members will not have any significant authority over the wholesale rate to be charged or the rate design that is employed. Additionally, the members are robbed of the benefits of diversity and economies of scale that they previously enjoyed as pre-bankruptcy members of Cajun. Finally, the rate now includes profit for Generating, whereas no profit was paid for the electricity generated by the Cajun assets prior to bankruptcy.

The Members were willing to be bound to the terms of the Supply Contracts based upon their principal cause or motive of obtaining generating capacity and the benefits associated therewith. If the modification of the Supply Contracts created by the Trustee's Plan, in its current form, were to be allowed, the Supply Contracts which require the Members to purchase power from Cajun will become invalid based upon a failure of cause. The court cannot and will not allow such a result.

Accordingly, judgement is rendered in favor of the Plaintiffs with respect to Count VII(A). Judgment, however, will be entered denying the relief requested by Counts VII(B) and VII(C).

## TRUSTEE'S COUNTERCLAIMS

As the court has found for the Trustee as to Counts I and II, the Trustee's Counterclaims are moot. Thus, the court **DENIES** the Trustee's Motion for Summary Judgment with respect to Counts I and II of its Counterclaim.

## CONCLUSION

The Trustee's Motion for Summary Judgment is **GRANTED** with respect to Counts I, II, IV, V, and VIII. The Trustee's Motion for Summary Judgment is **DENIED** with respect to Counts VI and VII. The Members' Motion for Summary Judgment is **DENIED** in all respects. Based upon the court's ruling with regard to Counts I and II, Count III is **DISMISSED AS MOOT.**

With regard to Count VI, the court grants judgment in favor of the Members on Count VI(A), Count VI(B)(2) and Count VI(B)(3). The court grants judgment in favor of the Trustee on Counts VI(B)(1) and Count VI(B)(4).

With regard to Count VII, the court grants judgment in favor of the Members on Count VII(A) The court grants judgment in favor of the Trustee on Count VII(B) and (C).

A separate order in conformity with the foregoing reasons has this day been entered into the record of this proceeding.